# IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| Andy Cheal, Cheal,<br><br>v.<br><br>John Doe,<br><br>Defendant. | Case No. 1:25-cv-4329<br><br>District Judge<br><br>Magistrate Judge |

## COMPLAINT

Plaintiff, Andy Cheal ("Cheal" or "Plaintiff"") hereby brings the present action against "John Doe" as identified in Exhibit 2 to the Declaration of Andy Cheal (the "Defendant") and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Federal Copyright Act, 17 U.S.C. § 101, et seq., 28 U.S.C. § 1338(a)–(b), and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and this Court may properly exercise personal jurisdiction over Defendant since Defendant directly targets business activities toward consumers in the United States, including Illinois, through an ecommerce store operating under the seller alias evidenced in Exhibit 2 to the Declaration of

Andy Cheal (the "Seller Alias"). Defendant has targeted sales to Illinois residents by setting up and operating an e-commerce store that targets United States consumers through targeted Affiliate Marketing, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and on information and belief, have sold products bearing infringing versions of Plaintiff's federally registered copyrighted work to residents of Illinois. Defendant is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Cheal substantial injury in the State of Illinois.

## II. INTRODUCTION

3. Cheal files this action to combat e-commerce store operators who trade upon Cheal's reputation and goodwill by selling unauthorized and unlicensed products, including mobile phone cases using infringing and counterfeit versions of Cheal's federally registered copyright (the "Counterfeit Cheal Products"). Defendant operates ecommerce stores under a Seller Alias that advertises, offers for sale and sells Counterfeit Cheal Products to unknowing consumers.

4. Defendant attempts to avoid and mitigate liability by operating under a Seller Alias to conceal their identity and the full scope and interworking of their counterfeiting operation. Cheal is forced to file this action to combat the Defendant's counterfeiting of its registered copyright, as well as to protect unknowing consumers from purchasing Counterfeit Cheal Products over the Internet. Cheal has been and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable copyrights because of Defendant's actions and seeks injunctive and monetary relief.

## III. THE PARTIES

5. Plaintiff, Andy Cheal, is a freelance artist who creates realistic works inspired by wild English countryside flowers painted in layers by changing the viscosity of the paint to

create textured, 3D petals. Cheal has been creating art since he was a child. He attended The Royal College of Arts to learn the basic techniques of painting with traditional materials. He started painting wildflowers after his study of floriculture and has been working as an artist since, creating collections of work on this subject.

6. This action has been filed by Plaintiff to combat online copyright infringers who trade upon Plaintiff's reputation, goodwill, and valuable copyright by selling and/or offering for sale counterfeit products in connection with Plaintiff's illustration. In addition, Defendant is selling unauthorized products that are based on and derived from the copyrighted subject matter of Plaintiff's illustration. .

7. Cheal is the owner of United States Copyright Registration No. VA0002435731 (the "Cheal Work") and the registration is attached hereto as **Exhibit 1**. Upon information and belief, the copyright has an effective date that predates the Defendant's acts of copyright infringement.

8. Cheal has invested substantial time, money, and effort in making the Cheal Work and developing consumer awareness, goodwill, and recognition in the Cheal Work.

9. As a result of Plaintiff's efforts, the quality of the Cheal Products and the promotional efforts for Cheal's products and designs, members of the public have become familiar with the Cheal Work and associate them exclusively with Cheal.

10. Cheal has made efforts to protect Cheal's interests in and to the Cheal Work. No one other than Cheal and Plaintiff's licensees are authorized to manufacture, import, export, advertise, create derivative works, offer for sale, or sell any goods utilizing the Cheal Work without the express written permission of Cheal.

11. Defendant owns and/or operates the e-commerce store under the Seller Alias and/or other seller aliases not yet known to Cheal. On information and belief, Defendant

resides and/or operates in the People's Republic of China or other foreign jurisdictions with lax copyright enforcement systems or redistributes products from the same or similar sources in those locations. The Defendant has the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

12. Tactics used by Defendant to conceal their identities and the full scope of their operation make it virtually impossible for Cheal to learn Defendant's true identities and the exact interworking of their counterfeit network. If Defendant provides additional credible information regarding their identities, Cheal intends to take appropriate steps to amend the Complaint.

### IV. DEFENDANT'S UNLAWFUL CONDUCT

13. In an effort to illegally profit from the creative content of the Cheal Work, Defendant has created a highly marketed Internet Store designed to appear to be selling original Products.

14. The rise of online retail and affiliate marketing links, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken by Cheal.

15. Third party service providers like those used by Defendant do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." (See Exhibit 2, Daniel C.K. Chow, Alibaba, Amazon, and Counterfeiting in the Age of the Internet, 40 NW. J. INT'L L. & BUS. 157, 186 (2020).).

16. In its report on "Combating Trafficking in Counterfeit and Pirated Goods," the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans found that on "at least some e-commerce platforms, little identifying information is necessary for a

counterfeiter to begin selling" and recommended that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. (Exhibit 3 hereto at 11, 35 (Jan. 24, 2020).) The report also notes that counterfeit 19 products account for billions in economic losses, resulting in millions of lost jobs for legitimate businesses. (Id. at 18-19.)

17. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store fronts. (Id. at 22.) Since platforms generally do not require a seller to identify its underlying business entity, counterfeiters can have many different profiles that appear unrelated even though they are commonly owned and operated. (Id. at 39.) Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." (Id. at 25.)

18. Defendant has targeted sales to Illinois residents by setting up and operating e- commerce stores that target United States consumers using a Seller Alias, offering shipping to the United States, including Illinois, accepting payment in U.S. dollars and, on information and belief, have sold Counterfeit Cheal Products to residents of Illinois.

19. Defendant has developed and distributed customized internet links, commonly referred to in digital marketing as "affiliate links", that direct anyone who clicks on them to Defendant's online store. These links do not function like regular website addresses. Instead, they contain embedded tracking information that identifies and records which individual or source directed the user to the store. This allows Defendant to monitor how much internet traffic and how many sales are generated from each link.

20. In the present case, Defendant has created such affiliate links for various social media personalities, also known as "influencers," each of whom has a large online following ranging from approximately 10,000 to three million people. Defendant provides each

influencer with a unique affiliate link and encourages them to include this link in their social media content, particularly in videos or posts where the influencer gives a positive review of the infringing product. When followers of these influencers watch the videos or see the posts, they are encouraged to purchase the product by clicking on the link provided. Because the link is uniquely tied to that influencer, Defendant can track exactly how many people clicked the link and whether those people made a purchase. This tracking system enables Defendant to pay commissions to each influencer based on the number of customers or sales they personally bring in, attached hereto as **Exhibit 4.**

21. This marketing approach allows Defendant to promote and sell the infringing product to a very large audience, while avoiding the upfront expenses typically associated with traditional advertising campaigns. Instead, Defendant only pays the influencers after traffic or sales are generated. As a result, Defendant is able to achieve widespread exposure and substantial revenue from the infringing product without traditional, upfront advertising costs.

22. This method allows Defendant to achieve broad visibility quickly whilst causing consumer confusion as to the true origin of the Cheal Works being illegally copied by the Defendant.

23. Sadly, this particularly sophisticated infringer has decided to trade upon Plaintiff's reputation, goodwill, and valuable copyright by selling and/or offering for sale products in connection with Plaintiff's illustration. The aggregated effect of the mass piracy that is taking place has overwhelmed Plaintiff and Plaintiff's ability to police Cheal's rights against the masses of illegal infringing products Defendant is offering at prices below an original.

24. To be able to offer the infringing products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, infringers act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal pirating network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks. **The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.**
>
> . . .
>
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these

activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated- goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 5**.

25. Telecommerce giant Alibaba has also made public its efforts to control piracy and counterfeiting on its platform. It formed a special task force that worked in conjunction with Chinese authorities for a boots-on-the-ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

## Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20 

BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

See Xinhua, Fighting China's Counterfeits in the Online Era, China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm (Exhibit 3).

26. Cheal has been and continues to be irreparably harmed through loss of control over Cheal's reputation, goodwill, ability to license and control the quality of goods featuring the Cheal Work. The rise of eCommerce as a method of supplying goods to the public exposes Copyright holders and content creators that make significant investments in their products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion

in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.

…

The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer

demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

. . .

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2)** at 4, 8, 11.

27. Not only are the creators and copyright owners harmed, the public is harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e- commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers. The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on

> American consumers and businesses. <u>This illicit trade</u> <u>must be stopped in its tracks</u>.

*Id.* at 3, 4. (Underlining in original).

28. Plaintiff's investigation shows that the telltale signs of an intentional counterfeiting operation. The Defendant is using an online storefront designed to appear to be selling genuine Cheal Products, while selling inferior imitations of Plaintiff's Cheal Products. Cheal is forced to file this action to combat the Defendant's infringement of Plaintiff's Cheal Work, as well as to protect unknowing consumers from purchasing unauthorized Cheal Products over the internet.

29. This Court has personal jurisdiction over Defendant because Defendant conducts significant business in Illinois and in this judicial district. Furthermore, the acts and events giving rise to this lawsuit were undertaken in Illinois and in this judicial district. In addition, Defendant has offered to sell and ship infringing products into this judicial district.

**V. THE DEFENDANT'S UNLAWFUL CONDUCT**

30. Upon information and belief, Defendant facilitates sales by designing Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine Cheal Products.

31. Defendant intentionally conceals its identity and the full scope of its piracy operations in an effort to deter Cheal from learning the Defendant's true identity and the exact interworking of the Defendant's illegal operations. Through the operation of the Defendant Internet Store, Defendant is directly and personally contributing to, inducing, and engaging in the sale of Infringing Products. Upon information and belief, Defendant and those it is working with are in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Infringing Products.

32. Upon information and belief, at all times relevant hereto, Defendant in this action has had full knowledge of Plaintiff's ownership of the Cheal Work, including Cheal's exclusive right to use and license such intellectual property and the goodwill associated therewith.

33. The Defendant in this case and the defendants in other similar cases against online infringers use a variety of common tactics to evade enforcement efforts. For example, infringers like Defendant will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit. Infringers also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2021 U.S. Customs and Border Protection report on seizure statistics indicated that e-commerce sales accounted for 13.3% of total retail sales with second quarter of 2021 retail e-commerce sales estimated at $222.5 billion. U.S. Customs and Border Protection, *Intellectual Property* Right Seizure Statistics, FY 2021 (https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20%20FINAL%20%28508%29.pdf) at 23. A true and correct copy of CBP's FY 2021 report is attached hereto as **Exhibit 4**.

34. In FY 2021, there were 213 million express mail shipments and 94 million international mail shipments. Id. Nearly 90 percent of all intellectual property seizures occur in the international mail and express environments. Id. at 27. The "overwhelming volume of small packages also makes CBP's ability to identify and interdict high risk packages difficult." *Id.* at 23.

35. Further, infringers such as the Defendant typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. ("PayPal") accounts, behind

layers of payment gateways so that they can continue operation in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendant maintains offshore bank accounts and regularly moves funds from their PayPal accounts to offshore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore infringers regularly move funds from U.S.-based PayPal accounts to foreign-based bank accounts, such as China-based bank accounts, outside the jurisdiction of this Court.

36. The Defendant, without any authorization or license, has knowingly and willfully pirated Plaintiff's Cheal Work in connection with the advertisement, distribution, offering for sale, and sale of illegal products into the United States and Illinois over the internet.

## COUNT I COPYRIGHT INFRINGEMENT

37. Cheal repeats and incorporates by reference herein the allegations contained in the above paragraphs of this Complaint.

38. The Cheal Work has significant value and has been produced and created at considerable expense.

39. At all relevant times, Cheal has been the holder of the pertinent exclusive rights infringed by the Defendant, as alleged hereunder, including but not limited to the Cheal Work, including derivative works. The Cheal Work is the subject of a valid Copyright Registration Certificate issued by the Register of Copyrights. (Exhibit 1).

40. The Defendant, without the permission or consent of Cheal, has sold and continues to sell online pirated derivative works of the copyrighted Cheal Work. Defendant has violated Plaintiff's exclusive rights of reproduction and distribution. The Defendant's

actions constitute infringement of Plaintiff's exclusive rights protected under the Copyright Act (17 U.S.C. §101 et seq.).

41. The foregoing acts of infringement constitute a course of willful and intentional disregard of the rights of Cheal. Cheal has no adequate remedy at law, and if the Defendant's actions are not enjoined, Cheal will continue to suffer irreparable harm to its reputation.

42. The injuries and damages sustained by Cheal have been directly and approximately caused by the Defendant's wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Infringing Products.

**PRAYER FOR RELIEF**

WHEREFORE, Cheal prays for judgment against Defendant as follows:

43. That Defendant, their affiliates, officers, agents, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

1) Using the Cheal Work or any reproductions, copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not an authorized Cheal Product or is not authorized by Cheal to be sold in connection with the Cheal Work;

    a. Using the Cheal Work or any reproductions, copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not an authorized Cheal Product or is not authorized by Cheal to be sold in connection with the Cheal Work;

b. passing off, inducing, or enabling others to sell or pass off any product or not produced under the authorization, control, or supervision of Cheal and approved by Cheal for sale under the Cheal Work;

c. Committing any acts calculated to cause consumers to believe that Defendant's Pirated Cheal Products are those sold under the authorization, control or supervision of Cheal, or are sponsored by, approved by, or otherwise connected with Cheal;

d. Further infringing the Cheal Copyrights and damaging Plaintiff's goodwill;

e. Manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Cheal, nor authorized by Cheal to be sold or offered for sale, and which are derived from Plaintiff's copyright in the Cheal Work or bear any of Plaintiff's Copyrights in the Cheal Work.

f. For entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Wish.com, TikTok Shop and DHgate shall disable and cease displaying any advertisements used by or associated with the Defendant in connection with the sale of infringing goods which are derived from Plaintiff's copyright in the Cheal Work or bear any of Plaintiff's Copyrights in the Cheal Work.

g. Committing any acts calculated to cause consumers to believe that the Defendant's Infringing Products are sold under the authorization, control

or supervision of Cheal, or are sponsored by, approved by, or otherwise connected with Cheal.

h. Further infringing the Cheal Work and damaging Plaintiff's goodwill;

and

i. Manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Cheal, nor authorized by Cheal to be sold or offered for sale, and which bear any of Plaintiff's copyrights, including the Cheal Copyrights, or any reproductions, counterfeit copies or colorable imitations thereof;

45. That Defendant be ordered to account for and disgorge to Cheal be awarded actual damages and such profits derived from Defendant's unlawful acts pursuant to 17 U.S.C. § 504(b). In the alternative, Cheal seeks statutory damages for willful infringement pursuant to 17 U.S.C. § 504(c)(2) in the amount of $150,000. Cheal further requests an award of its reasonable attorneys' fees and costs, and such other relief as the Court deems just and proper.

DATED: April 21, 2025	Respectfully submitted,

_Counsel for Andy Cheal_
Paul Kossof. (ARDC #6319307)
KossofIPR 875 N. Michigan Ave,
Suite 3115 Chicago, IL 60611
224-433-1553
p.kossof@kossofipr.com